THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| JUSTEN GOODALL, on behalf of himself and all others similarly situated,<br><br>                Plaintiff,<br><br>    v.<br><br>HOYT ARCHERY, INC.; ARCHERY TRADE ASSOCIATION, INC.; BOWTECH INC.; BPS DIRECT, LLC d/b/a BASS PRO SHOPS; CABELA'S LLC; DICK'S SPORTING GOODS, INC.; JAY'S SPORTS, INC. d/b/a/ JAY'S SPORTING GOODS; KINSEY'S OUTDOORS, INC.; LANCASTER ARCHERY SUPPLY, INC.; MATHEWS ARCHERY, INC.; NEUINTEL LLC d/b/a PRICESPIDER f/k/a ORIS INTELLIGENCE; PRECISION SHOOTING EQUIPMENT, INC.; TRACKSTREET, INC.,<br><br>                Defendants. | **PROPOSED CLASS ACTION COMPLAINT**<br><br>Case No. _____<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................1

II.     JURISDICTION AND VENUE ............................................................13

III.    PARTIES ...............................................................................................14

   A.  PLAINTIFF .........................................................................................14
   B.  DEFENDANTS .....................................................................................14
      a)  Upstream Manufacturer Defendants...............................................14
      b)  Downstream Retailer and Distributor Defendants .....................15
      c)  Trade Association Defendants ....................................................18
      d)  Co-Conspirators and Agents ......................................................18

IV.     CLASS ACTION ALLEGATIONS......................................................20

V.      FACTUAL ALLEGATIONS ...............................................................22

   A.  THE ARCHERY PRODUCTS MARKET ...................................................22
   B.  THE ATA'S ORGANIZATION AND PREEMINENT ROLE IN THE ARCHERY
   PRODUCTS SUPPLY CHAIN ......................................................................24
      a)  Board of Directors.......................................................................25
      b)  Retail Council..............................................................................27
      c)  Trade Show...................................................................................30
      d)  ATA Connect.................................................................................30
   C.  DEFENDANTS' CONSPIRACY .............................................................32
      a)  ATA Members Grow Increasingly Concerned by Growing Retail
      Competition...........................................................................................33
      b)  The ATA Takes Action, Coordinating an Agreement to Artificially Fix,
      Raise, Maintain, or Stabilize Prices for Archery Products Sold in the United
      States....................................................................................................35
      c)  Defendants' Conspiracy, Facilitated by the ATA, Gains Momentum.........42
      d)  With Industry-Wide Adoption and Implementation of MAPs on Archery
      Products, Defendants Stress Industry-Wide Enforcement In Furtherance Of
      Their Agreement ...................................................................................52
      e)  By 2020, Defendants' Efforts Become More Covert, But Their Competitor-
      Facing Assurances of Continued Compliance to Industry-Wide MAP Continue
         63

    *f)* *Defendants' Conspiracy Continues Through the Present*..........................*65*

    D.  Defendants' Conduct Has Had Anticompetitive Effects....................66

**VI.   THE RELEVANT MARKET** ........................................................**70**

**VII.  DEFENDANTS' FRAUDULENT CONCEALMENT**...........................**72**

**VIII. PLAINTIFF'S CLAIM FOR RELIEF**.............................................**73**

    Violation of the Sherman Act (15 U.S.C. §§ 1 and 3) .................................73

**IX.   PRAYER FOR RELIEF** .......................................................................**75**

**X.    DEMAND FOR TRIAL BY JURY**.................................................**76**

## I.    <u>INTRODUCTION</u>

1.    Plaintiff Justen Goodall ("**Plaintiff**") brings this action under federal antitrust law, on behalf of himself and all others similarly situated (the "Class," defined *infra*), seeking to recover overcharge damages on Archery Products (defined *infra*) resulting from an agreement between Defendants (defined *infra*) to artificially raise prices, including through the collective implementation and enforcement of minimum advertised pricing policies ("MAP" or "MAPs") , and using Defendant **Archery Trade Association** ("ATA") to implement and enforce the agreement across its membership, which spans the majority of Archery Products manufacturers, distributors, and retailers.

2.    The cartel, chiefly but not exclusively implemented through Defendant **ATA**—which counts among its members the most prominent and influential Archery Products manufacturers, distributors, and retailers in the United States— was designed to artificially raise prices and prevent price competition on Archery Products at the retail level. The ATA describes the cartel's goals (and efficacy) as "level[ing] the playing field for all retailers, . . . eliminat[ing] the 'race to the bottom' that would occur if retailers endlessly competed to reduce prices," ensuring "all retailers compete fairly and evenly on service instead of price," and avoiding "price wars with other retailers" that would benefit consumers but reduce the cartel

1

members' profits.

3.      The primary means by which Defendants (defined *infra*) and their co-conspirators operate the cartel is through an agreement to artificially fix, raise, maintain, or stabilize prices, including through the widespread adoption, implementation, and enforcement of minimum advertised price ("MAP") policies. MAPs represent an artificial price floor, or the "lowest price a retailer can advertise the products for sale," including "online or anywhere in print." The conduct here constitutes a *per se* violation of antitrust law because direct competitors entered into a horizontal agreement to fix, raise, maintain, or stabilize prices. Here, Defendants **Bass Pro Shops**, **Cabela's**, **DICK'S Sporting Goods**, and other direct retail competitors, working through the ATA trade association, entered into a horizontal agreement to fix, raise, maintain, or stabilize prices, including by pressuring manufacturers to simultaneously adopt MAP policies for the express purpose and effect of fixing, raising, maintaining, or stabilizing prices. Defendants and their co-conspirators conspired to fix the prices of—and eliminate price discounting and competition for—Archery Products, by working together to ensure that all retailers charged at or above the prices set by MAPs.

4.      While some individual manufacturer MAP policies existed within the Archery Products industry as early as the 2000s, they were uncommon. Enforcement

was largely toothless and lacked any collective enforcement action by manufacturers. This lack of enactment and enforcement made economic sense in this industry because unilateral adherence to MAP policies was not in any one company's unilateral economic self-interest. Individual market participants adhering to MAP policies (whether at the manufacturer, distributor, or retailer level) risked being undercut on price and losing market share to their respective horizontal competitors that were not adhering to such policies. Ben Summers, the Director of Operations for Manufacturer T.R.U. Ball Archery and former Vice Chairman of the ATA Board of Directors, explained the economic reality that necessitated coordinated conduct and prevented unilateral imposition of MAP policies: "If I'm really good at keeping my products at the MAP price, and I have a competitor who isn't keeping a MAP policy, and their product costs less than mine, I can lose lots of sales."

5.    The ATA and Archery Products manufacturers, distributors, and retailers recognized that each company's unilateral economic self-interest to compete on price could only be overcome by an anticompetitive agreement and through collective action. But they also recognized that such an agreement and mutual assurances were prohibited by the antitrust laws.

6.    Industry publications recognized that coordinated enforcement of MAP

policies among Archery Products manufacturers, distributors, and retailers risked antitrust scrutiny, stating in 2010 that "[a]lthough some manufacturers and retailers ask the [ATA] to step in and make dealers and online retailers adhere to MAPs, that would exceed the ATA's authority." A member of the ATA's Board of Directors similarly acknowledged that "'[t]here's nothing the ATA can legally do when it comes to enforcement[.] There's no rule the ATA can set down and say, 'This is what you must do.'"

7.    Despite recognizing that coordinated and collective adoption, implementation, and enforcement of MAP policies constitutes an anticompetitive agreement prohibited by the antitrust laws, beginning in 2014, that is exactly what the ATA and its members sought to accomplish—and they succeeded. Remarking on these coordinated efforts, one Archery Products retailer noted that he hoped the ATA and its members would be "successful in establishing an industry wide rule set that will be enforced industry wide."

8.    The shift in the ATA's philosophy was recognized in a since-deleted December 31, 2014 invitation to collude from the ATA's former CEO and President, Jay McAninch ("McAninch") to its members, titled "***MAP: United We Stand, Divided We Fall***," in which he relayed: "In the months ahead, [the ATA will] facilitate a dialogue that examines what our industry's business leaders think can

and should be done about MAP . . . . We can't solve industry problems until we *involve everyone in a conversation that shares concerns and develops a course of action* . . . . [But o]nce we have a clear sense of what MAP is about for ATA members, we can start a process that deals with it."

9.      Strikingly, just a few months before the ATA's invitation to collude, the ATA Board of Directors added the two largest retailers of Archery Products in the United States: Defendants **Bass Pro Shops** and **Cabela's**. The ATA's McAninch referred to Bass Pro Shops and Cabela's as "cohort[s] in crime" that "shared in [the ATA's] future and, more important, were serious about contributing to the success of the archery and bowhunting industry." Immediately after the inclusion of Bass Pro Shops and Cabela's as board members, the ATA began its campaign to artificially raise prices through MAP policies.

10.      On January 10, 2015, at the ATA Trade Show, "[a]bout 60 representatives of ATA-member manufacturers, distributors and retailers attended [a] meeting to review a sample MAP/MPR policy[.]"The ATA's McAninch explained that "companies can use the sample policy as a starting point in crafting customized policies to protect each product's publicly advertised minimum price."

11.    Shortly thereafter, the ATA tweeted, "Three steps to developing a sample Minimum Advertised Price policy," that linked to a now-deleted article on the ATA's website titled, "ATA Helps Members Develop MAP Policies." In that article, the ATA reflected on the January 10, 2015 meeting, and explained that "[i]f ATA members want to control the minimum advertised price (MAP) . . . of their products, each business must create its own policy statement, issue it to all resellers, and then enforce it consistently and forcefully with no negotiations."

12.    The ATA's efforts, led by retailer members such as Defendants **Bass Pro Shops** and **Cabela's**, were effective. For example, in June of 2015, Defendant **Kinsey's**, one of two major distributors of Archery Products, announced that it would "stand[] behind manufacturers in the implementation of MAP policies" and would assist in their enforcement.

13.    In 2016, the ATA tweeted, "How does Minimum Advertised Price (MAP) impact the #archery and #bowhunting industry? ATA members weigh in." The tweet linked to a now-deleted webpage on the ATA's website titled, "ATA Members Weigh in on MAP," in which the ATA and various industry participants commented on the ATA's and its members' efforts to adopt, implement, and enforce industry-wide MAP policies. The article noted, among other things, that "the ATA and its member companies have worked tirelessly to discuss, craft and enforce MAP

6

policies that could help manufacturers, retailers and the industry" and that "***ATA staff . . . facilitate[d] conversations between retailers and manufacturers***" concerning MAPs. Another industry participant observed: "[The] ATA has done an excellent job of ***getting all the main players from retailers to manufacturers to sales reps in the same room*** and presenting the facts and sample policies . . . . If you have a [MAP], ***it must be enforced***."

14.     These conversations continued at the 2016 ATA members-only Trade Show, where historical competitors discussed the need for unity on MAP policies behind closed doors. One attendee of the 2016 trade show remarked, "***The archery industry is uniting as one, understanding that we are all in this together***, and that the unity is ultimately what will help us grow."

15.     In 2017, the ATA posted on its Facebook page, "How do MAP policies impact our industry's long-term success? Find out," which linked to a now-deleted article on the ATA's website titled, "MAP: What is it? Why Does it Exist?" In that article, the ATA urged retail members to "follow[] good MAP policies, which means those enforced by manufacturers. When you're part of the solution, ***you'll make more money***." In addition, the ATA told its retail members: "***If a manufacturer doesn't have a policy, or doesn't enforce its policy, call the company and express your concerns. Encourage them to work with the ATA to develop a MAP policy or***

7

***improve their current policy***."

16.     Also in 2017, the ATA launched its login-restricted MAP Resource Library, which "helps retailers learn which manufacturers have MAP policies, and helps retailers to understand and comply with them." The ATA also launched a members-only forum called "ATA Connect," which the ATA touts as an "online discussion community created exclusively for ATA members" seeking "a safe, confidential space to network and solve industry challenges through constructive discussions." In connection with the launch of the MAP Resource Library, the ATA explained to its members: "the Archery Trade Association offers resources to help ATA members comply with MAP guidelines . . . . The ATA has asked all ATA-member manufacturers to provide their policies so they can be included in the MAP Resource Library." And in connection with the launch of ATA Connect, the ATA urged its members to "work with [their] peers to find solutions that boost business and benefit the industry by tackling topics like MAP policies, buying patterns, and setting appropriate charges for service work."

17.     In 2018, the ATA updated its website to notify manufacturer members: "The ATA will work with you to develop a MAP policy," to prompt manufacturer members to send the ATA their MAPs to load onto the members-only "resource library," and to caution retailer members that it is their "***responsibility to know MAP***

8

*policies and follow them*."

18.     The Defendants' blitz messaging and agreement to fix, raise, maintain, or stabilize prices was effective across the industry. As one retailer said in 2019, "Let's face it: most archery shops are in areas where bow pricing is highly competitive from shop to shop. We all want to get the sale, but fortunately manufacturers set MAP pricing on bows, which mostly prevents one shop from grossly undercutting another on pricing. That way, we all get our piece of the pie." Another small retailer similarly stated, "[W]e hold fairly tight on [MSRP] because manufacturers commonly have MAP pricing we must abide by in order to maintain dealership status."

19.     The ATA and the Defendant retailers coordinated enforcement actions in furtherance of their illegal agreement to raise prices through 2019. The ATA posted on both Twitter and Facebook: "Companies with effective MAP programs set clear policies **and enforce them as if they're hunting coyotes**, which means the season never ends and the challenge never dies." The posts linked to an article that noted, in relevant part:

> MAP policies require vigilant enforcement, which means **good communications between manufacturers, distributors and retailers** . . . . If a company creates a good partnership with its distributors and retailers to catch violators, it can cut them out of the supply chain and force them to look for easier prey . . . . Enforcing MAP will never get easier. That's why it's so important for ATA members **to work together**

*as much as possible*.
The ATA recognized that unilateral enforcement of MAP was not enough, so it
facilitated collective action and agreement between manufacturers, distributors, and
retailers in order to enforce MAP policies together.

20.     As a distributor, Defendant **Kinsey's** explained on its website in 2019,
MAP "is the price set by the manufacturers not to be undersold. It is the dealer's
responsibility to make sure you are at or above MAP on various products . . . . If
your company has fallen below MAP prices, you will be restricted from purchasing
these products from Kinsey's South *immediately*."

21.     The Defendants' agreement affected the entire industry. Among other
effects, MAPs restrict competition and increase retail prices through at least two
mechanisms. First, by eliminating the ability of competing retailers to attract
customers by publicly advertising lower retail prices, MAPs reduce retailers'
incentives to compete on price because those lower prices do not entice incremental
business to shop at the retailer. Second, whatever limited incentives to offer
discounts on retail prices remain after MAPs are adopted, MAPs set an artificially
high retail price from which price negotiations are initiated, ensuring that actual
transaction prices will be higher than would otherwise be the case.

22.     Moreover, notwithstanding being called "MAP policies" by Defendants

and their co-conspirators, many of these policies are, in fact, minimum retail price ("MRP") policies, also referred to as resale price maintenance ("RPM") policies, which institute price floors on end sales prices as well as advertised prices. Wyvern Creations, an Archery Products retailer, explained:

> Many MAP agreements state that you are more than able to sell below MAP but if you do you will simply not be allowed to sell the product. Quite a few dealers have found out their sources simply will not sell to them after violating MAP. **The reality is that many MAP agreements (Scorpyd or Tenpoint for example) are actually MRP (minimum retail price)**.
> . . . .
> **The big mistake here is that in many instances MAP DOES limit the actual selling price if the dealers want to continue to sell the product**. The attitude (and basically what is in the agreement) from the manufacturers is that "you can sell for whatever you want . . . but I don't have to sell my product to you if you choose to do so." Consumers generally don't like it . . . . [T]hey feel the "bottom line" should be fluid and the "race to the bottom" is how dealers have to compete. **Dropping your price is the easiest and worst way to compete**.

23.     Indeed, economists view MAPs as even more effective at facilitating cartel outcomes than MRP/RPM policies. Economist John Asker wrote:

> MAP policies can allow a manufacturers' cartel to attain greater surplus extraction than a cartel that does not use MAP or RPM and strengthens the dynamic incentives that give the cartel stability. As such, in this setting with search frictions, **MAP appears to be a more effective cartel facilitation device than RPM**.

24.    These coordinated MAPs have benefited the industry collectively, allowing retailers and distributors to "strive for a minimum of 40% profit," according to the industry trade association National Archery Buyers Association ("NABA"). As one Archery Products retailer observed, "Every dealer I have ever talked to thinks everything in archery is overpriced today, just as I do . . . . [I]s archery overpriced, absolutely."

25.    In or around 2021, the ATA and its members apparently became concerned that their coordinated success at implementing their anti-competitive agreement to increase prices might draw scrutiny. To that end, at some time after June 12, 2021, the ATA began scrubbing its website of nearly every reference to its central role in the conspiracy.

26.    Notwithstanding the attempts to hide this anticompetitive agreement to adopt, implement, and enforce industry-wide MAP policies, the agreement to artificially fix, raise, maintain, or stabilize Archery Products retail prices, which is a *per se* unlawful agreement to restrict price competition under the federal and state antitrust laws, is still on-going. As a result, Archery Products consumers continue to pay artificially high prices.

## II.  **JURISDICTION AND VENUE**

27.    Plaintiff brings this action pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26) to obtain injunctive relief and to recover damages (including treble damages), costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

28.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1367.

29.    This Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act (15 U.S.C. § 22), Federal Rule of Civil Procedure 4(h)(1)(A), and the long-arm statute of Utah. Utah Code Ann. § 78B-3-205.

30.    Defendants, directly or through their agents, subsidiaries, affiliates, or parents may be found in and transact business in the forum state.

31.    Defendants, directly or through their agents, engage in interstate commerce in the production, distribution and/or sale of Archery Products.

32.    Defendants, directly or through their agents, engaged in unlawful acts alleged herein within this District that had effects within this District.

33.    Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15 and 22, and pursuant to 28 U.S.C. § 1391(b) and (c), in that at least one of the Defendants resides in this judicial district, is licensed to do business, or is doing business in this

judicial district.

## III.  PARTIES

### A. Plaintiff

34.   Plaintiff Justen Goodall is a citizen of Montezuma County, Colorado who purchased one or more Archery Products subject to a MAP during the Class Period (defined *infra*).

### B. Defendants

#### a)   *Upstream Manufacturer Defendants*

35.   Defendant Hoyt Archery, Inc. ("**Hoyt**") is a Utah corporation with its primary place of business at 593 N Wright Brothers Drive, Salt Lake City, Utah. At all relevant times, Hoyt was a member of the ATA with a representative on its Board of Directors; sold Archery Products subject to a MAP; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

36.   Defendant Bowtech Inc. ("**Bowtech**") is a Delaware corporation with its primary place of business at 90554 Highway 99 N, Eugene, Oregon. At all relevant times, Bowtech was a member of the ATA with a representative on its Board of Directors; sold Archery Products subject to a MAP under the "Bowtech," "Excalibur Crossbow," "Diamond Archery," "Stryker Crossbows," and "Octane

14

Accessories" trade names; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States alleged herein.

37.     Defendant Mathews Archery, Inc. ("**Mathews**") is a Wisconsin corporation with its primary place of business at 919 River Road, Sparta, Wisconsin. At all relevant times, Matthews was a member of the ATA with a representative on its Board of Directors; sold Archery Products subject to a MAP; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

38.     Defendant Precision Shooting Equipment, Inc. ("**PSE**") is a Delaware corporation with its primary place of business at 2727 North Fairview Avenue, Tucson, Arizona. At all relevant times, PSE was a member of the ATA with a representative on its Board of Directors; sold Archery Products subject to a MAP; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States. PSE is owned by Heritage Outdoor Group LLC.

### b)    *Downstream Retailer and Distributor Defendants*

39.     Defendant Cabela's LLC ("**Cabela's**") was a Delaware limited liability company with its primary place of business at 1 Cabela Drive, Sidney, Nebraska. Cabela's has 171 retail locations throughout the United States, as well as an internet storefront. Until 2017, Cabela's was a member of the ATA with a representative on

its Board of Directors; sold Archery Products subject to a MAP; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States. In 2017, Cabela's was acquired by Bass Pro Shops.

40.     Defendant DICK'S Sporting Goods, Inc. ("**Dick's**") is a Delaware corporation with its primary place of business at 345 Court Street, Coraopolis, Pennsylvania. Dick's has 728 retail locations throughout the United States, as well as an internet storefront. At all relevant times, Dick's was a member of the ATA; sold Archery Products subject to a MAP; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

41.     Defendant BPS Direct, LLC, d/b/a Bass Pro Shops ("**Bass Pro Shops**") is a Delaware corporation with its primary place of business at 2500 E. Kearney Street, Springfield, Missouri. Bass Pro Shops has approximately 200 retail locations throughout the United States, as well as an internet storefront. At all relevant times, Bass Pro Shops was a member of the ATA; sold Archery Products subject to a MAP; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

42.     Defendant Jay's Sports, Inc. d/b/a Jay's Sporting Goods ("**Jay's Sporting Goods**") is a Michigan corporation with its primary place of business at 8800 S. Clare Avenue, Clare, Michigan. Jay's Sporting Goods has two retail

locations in Michigan and an internet storefront. At all relevant times, Jay's Sporting Goods was a member of the ATA with a representative on its Board of Directors; sold Archery Products subject to a MAP; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

43.    Defendant Kinsey's Outdoors, Inc. ("**Kinsey's**") is a Pennsylvania corporation with its primary place of business at 1660 Steelway Drive, Mount Joy, Pennsylvania. Kinsey's distributes outdoor goods, including Archery Products, to more than 4,600 retailers across the United States, in addition to its own retail location and internet storefront. At all relevant times, Kinsey's was a member of the ATA with a representative on its Board of Directors; sold Archery Products subject to a MAP; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

44.    Defendant Lancaster Archery Supply, Inc. ("**Lancaster**") is a Pennsylvania corporation with its primary place of business at 2195A Old Philadelphia Pike, Lancaster, Pennsylvania. Lancaster describes itself as "a leading worldwide archery distributor" with its own retail location and internet storefront. At all relevant times, Lancaster was a member of the ATA with a representative on its Board of Directors; sold Archery Products subject to a MAP; and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the

United States.

### c) *Trade Association Defendants*

45.     Defendant Archery Trade Association, Inc. (**"ATA")** is a Virginia corporation with its primary place of business at 117 South Valley, New Ulm, Minnesota. The ATA is the trade association that represents the economic interests of corporations involved in the manufacture, wholesale, retail, sales, and distribution of Archery Products. According to the ATA, one of its primary purposes is to "maintain and enhance the profitability and economic viability of individuals, companies and corporations in the archery industry." At all relevant times, the ATA engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

### d) *Co-Conspirators and Agents*

46.     Defendant TrackStreet, Inc. (**"TrackStreet**") is a Delaware corporation with its primary place of business at 9811 W Charleston Blvd, Suite 2-776, Las Vegas, Nevada. At all relevant times, TrackStreet provided Defendants with software to create, track, and enforce their MAP policies. In particular, TrackStreet provides brands with digital tools to track and enforce pricing policies such as MAP policies. Features include on demand notifications of MAP violations and customizable messages to send to violators. In addition, TrackStreet also helps

clients to formulate pricing policies, including MAP policies. At all relevant times, TrackStreet engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

47.     Defendant NeuIntel LLC, d/b/a PriceSpider, f/k/a Oris Intelligence ("**Oris**"), is a California corporation with its primary place of business at 20 Pacifica, Suite 1000, Irvine, California. At all relevant times, Oris provided Defendants with software to create, track, and enforce their MAP policies. In particular, Oris touts its MAP monitoring solution, Prowl, as "the world's most advanced MAP monitoring software." Oris also advises on the content of MAP policies and provides MAP violation letter templates. At all relevant times, Oris engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

48.     Various other individuals and entities that are not named as defendants herein participated as co-conspirators with Defendants in the violations alleged herein and performed acts and made statements in furtherance of the conspiracy. Co-conspirators include, but are not limited to, all other entities that were ATA members at any relevant times.

49.     Defendants listed in Paragraphs 35 through 48 are collectively referred to as "the Defendants."

## IV.   CLASS ACTION ALLEGATIONS

50.    Plaintiff brings this action both on behalf of himself, and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), on behalf of the following class (the "Class"):

> All persons and entities residing in the United States or its territories that directly purchased Archery Products (defined *infra*) manufactured or distributed by an Archery Trade Association member, at any point between January 1, 2014 and the present (the "Class Period").

> Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

51.    *Numerosity*. Plaintiff does not know the exact number of Class members because such information is in the exclusive control of Defendants and co-conspirators. Plaintiff believes that, due to the nature of the trade and commerce involved, there are most likely hundreds of thousands of Class members, geographically dispersed throughout the United States, such that joinder of all Class members is impracticable.

52.    *Typicality*. Plaintiff's claims are typical of the claims of the Class in that Class members all purchased Archery Products subject to a MAP. All Class members were damaged by the same wrongful conduct of Defendants and their co-conspirators as alleged herein, and the relief sought is common to the Class.

53.    *Commonality*. Numerous questions of law or fact arise from Defendants' anticompetitive conduct that are common to the Class, including, but not limited to, the following:

(a)    Whether Defendants and co-conspirators engaged in a contract, combination, and/or conspiracy to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States;

(b)    Whether Defendants' and co-conspirators' conduct caused the prices of Archery Products sold in the United States to be sold at artificially high and supra-competitive levels;

(c)    Whether the Plaintiff and the other members of the Class were injured by Defendants' and co-conspirators' conduct, and, if so, the appropriate class-wide measure of damages for Class members; and

(d)    The scope of any injunctive relief to which Plaintiff and the other members of the Class are entitled.

54.    *Predominance*. These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members. In addition, Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as

a whole.

55.     ***Adequacy***. Plaintiff will fairly and adequately represent the interests of the Class in that he has no conflict with any other members of the Class. Furthermore, Plaintiff has retained competent counsel experienced in antitrust, class action, and other complex litigation.

56.     ***Superiority***. This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action. In addition, the prosecution of separate actions by individual Class and would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## V.     FACTUAL ALLEGATIONS

### A. The Archery Products Market

57.     Archery Products refers to products used by consumers for bowhunting or archery. For purposes of this action, Archery Products consists of five main product markets, submarkets, or cluster markets: (1) bows—including compound bows, recurve bows, longbows, and crossbows—and their components; (2) arrows (minus the arrowhead) and their components, including the shaft, fletching, and

nock;  (3) arrowheads (or arrowpoints) including broadheads and field points; (4) targets, including bag targets, foam targets, and 3D targets; and (5) accessories, such as bow cases, arrow quivers, sights and scopes, and stabilizers. According to the ATA, in 2020, "[t]he US ha[d] 9.9 million bowhunters, 17.6 million recreational archers and 5.4 million competitive archers . . . ." This equates to roughly 13% of the U.S. population over age thirteen.

58.    The United States' retail market for Archery Products has grown considerably over the past five decades. In 1974, this market was valued at "barely $100 million," but by 2004, it had grown to $535 million. By 2023, this market was estimated at roughly $1.2 billion.

59.    Archery Products are sold to consumers by retailers. Retailers purchase their Archery Products either directly from manufacturers, or through distributors who purchase directly from manufacturers. In general, multi-channel retailers,  such as national sporting goods stores, source their Archery Products directly from manufacturers, as do locally-owned specialty retailers such as larger pro shops (roughly 20% of pro shops). Smaller pro shops (roughly 80% of pro shops) generally source their Archery Products through distributors.

60.    In general, bows can cost consumers hundreds of dollars; arrows can cost more than $100 for six-packs; arrowheads can cost around $40 for 3-packs; and

targets range in cost from $50 to hundreds of dollars. In general, retail profit margins are about 27% on bows and 40% on other Archery Products.

### B. **The ATA's Organization and Preeminent Role in the Archery Products Supply Chain**

61.    The ATA is a trade association composed of businesses that manufacture, buy, and sell Archery Products. Consumers cannot join the ATA. According to its website, the ATA had just 505 members in 2000, roughly 950 members in 2003, and roughly 2,100 members in 2016. By 2023, ATA membership had surpassed 2,500 organizations.

62.    According to the ATA, eighty percent (80%) of its members are part of the Archery Products supply chain (*e.g.*, manufacturers, distributors, and retailers of Archery Products). That is, the ATA's membership is dominated by would-be horizontal competitors at every level of the Archery Products supply chain.

63.    The ATA provides numerous opportunities for its competitor-members to meet and discuss matters of import to their shared financial interests, including through its Board of Directors, its Retail Council, its annual Trade Show, and "ATA Connect." As set forth herein, Defendants seized on those opportunities to conceive of and perfect their conspiracy to adopt, implement, and enforce industry-wide MAPs on Archery Products. Each of these opportunities is discussed in greater detail below.

### a) Board of Directors

64.    The ATA is governed by a Board of Directors composed of Archery Products manufacturers, distributors, and retailers. According to the ATA, its "board guides ATA's actions and shapes the organization's policies and positions."

65.    The members of the ATA Board of Directors are entities that are actual or potential competitors with other members of the ATA's Board. As alleged herein, the ATA has, at the direction and with the knowledge of its Board of Directors, promulgated rules, guidelines, practices, and procedures that have substantially restrained retail price competition for Archery Products sold in the United States.

66.    The ATA Board of Directors, by fiscal year, is shown in the below chart:

| ATA Board of Directors, by year | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Organization | Representative(s) | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
| Number of Board Members: | | 18 | 17 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 |
| 3Rivers | Teresa Williams | | | X | X | X | X | X | X | X | X | X |
| ArchersUSA | Timmy Thomas | | | | | | | X | X | | | |
| Archery Headquarters | Randy Phillips | X | X | X | X | X | X | X | X | X | X | X |
| Archery Only | Wayne Piersol | | | X | X | X | X | X | X | X | X | X |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ARRO** | Deb Colgrove; Will Moulton | | | X | X | X | X | X | X | X | X | X |
| **ATA** | Matthew Kormann; Jay McAninch; Jeff Poole; Becky Lux | X | | X | X | X | X | X | X | X | | |
| **Bass Pro Shops** | Dean Snelson; Sean Streff; Darren Hogan | X | X | X | X | X | X | X | X | X | X | X |
| **Bear** | Jack Bowman; Jonathan Lene; Ryan Shutts | | X | X | | | X | X | X | X | X | X |
| **Black Eagle** | Randy Kitts | | | | | X | X | X | X | | | |
| **Bohning** | Scott Billsby | X | X | | | | | | | | | |
| **BowTech** | David Fee; Scott Henrickson | X | | | X | X | | | | | | |
| **Cabela's** | Tom Gallagher | X | X | | | | | | | | | |
| **Cimmarron** | Peter Gussie | X | X | | | | | | | | | |
| **Easton** | Aaron Lucky | | | | | | | | | X | X | X |
| **Gateway** | Todd Vaaler | | X | X | X | | | | | | | |
| **Genesis** | Todd Bahnub | | | X | | | | | | | | |
| **Headhunter** | Jeff Adee | X | X | X | | | X | X | X | X | | |
| **Hoyt** | Tom Driffil; Randy Walk | | | | X | X | X | X | X | | | |
| **Jay's Sporting Goods** | Mark Copeland | X | X | X | X | X | X | X | X | X | | |
| **JDE** | Greg Easton | X | X | X | | | | | | | | |
| **Kinsey's** | Justin Gorman; Dave Parker | | X | X | X | X | X | X | X | X | X | X |
| **Lancaster** | Rob Kaufhold | X | X | X | X | X | X | | | | | |

| Company | Contact | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Mathews** | Jerrod Hoff; Joel Maxfield | | | | X | X | X | X | X | X | X | X |
| **Morrell** | Dale Morrell | | | | | | | | | X | X | X |
| **Music City Archery** | Jeff Greer | | | | | | | | | | X | X |
| **MWS** | Kurt Bassuener | X | X | | | | | | | | | |
| **NABA** | Gary Kinard | | | X | X | X | X | X | X | X | X | X |
| **OutTech** | Jay Scholes; John Seliga | | | X | X | X | X | X | X | X | X | X |
| **Plano** | BJ Wolf | X | | | | | | | | | | |
| **PSE** | David Kronengold; Blake Shelby | X | X | X | X | X | X | | | | | |
| **Primos/Vista Outdoor Inc.** | Jimmy Primos; Jason Harris | X | X | X | X | X | | | | | X | X |
| **Pure Archery** | Dave Fleming; Jon Dumars; Mitch Mitchell; Jef Suiter | | | X | | | | | | X | X | X |
| **Rinehart Targets** | James McGovern | | | | X | X | X | X | X | X | X | X |
| **Robinson** | Scott Shultz | X | X | | | | | | | | | |
| **Scheel's** | Rod Hartl | | | | X | X | X | X | X | X | X | X |
| **SYKD** | Matthew Smith | | | | | | | | | X | X | X |
| **TenPoint** | Keith Arnold | | | | | | | X | X | X | X | X |
| **T.R.U. Ball** | Benjamin Summers | X | X | X | X | X | X | X | X | | | |
| **Wildlife Research Ctr.** | Steve Lambeth | | | | | | | | | | X | X |

*b)*   *Retail Council*

67.   The ATA Retail Council, led by retail member of the ATA Board of

27

Directors, was re-established in or around May of 2016 to "improve the industry's archery and bowhunting markets." When the Retail Council was relaunched, the ATA's President/CEO Jay McAninch ("McAninch") declared it "rejuvenated, highly engaged and ready to help forge a better future for everyone in our industry." Mark Copeland, the Retail Council's Chair and general manager of Defendant **Jay's Sporting Goods**, expressed the importance of retail leadership within the ATA: "We've needed an active and engaged platform for retailers to discuss important issues where the conversation is educational and productive. I keep hearing that retailers are the industry's backbone. I'm appealing to every archery retailer to use our backbone to step up and be part of the solution." The Retail Council meets regularly to "discuss pressing issues related to the ATA's strategic planning efforts," and "all industry happenings."

68.    One issue that the Retail Council discusses is MAP policies, including their enforcement. Kurt Smith, another member of the ATA Retail Council, has described MAP policies as "probably one of the most talked about topics in the archery industry." Retail Council members have also expressed their support for MAPs to the larger ATA membership. For example, one Retail Council member instructed that "manufacturers should create MAP policies, and retailers should honor them" because "***every business in the industry must work together as a group***

28

to be productive and profitable, which includes strong MAP policies and procedures." Another Retail Council member even warned other ATA members that "disobeying MAP policies . . . can have big consequences."

69.     Members of the ATA's Retail Council, by year, are set forth in the below chart:

| ATA Retail Council, by year | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Organization | Individual(s) | 201 | 201 | 201 | 202 | 202 | 202 | 202 | 202 |
| **Number of Council Members:** | | **12** | **12** | **15** | **15** | **15** | **14** | **14** | **14** |
| All Star Archery | Gary Kinard | X | X | X | X | X | X | X | X |
| Archery Headquarters | Randy Phillips; Marty Stubstad | X | X | X | X | X | X | X | X |
| Archery Only | Wayne Piersol | X | X | X | X | X | X | X | X |
| ARRO | Deb Colgrove | X | X | X | X | X | X | X | X |
| ATA | Kurt Smith; Nicole Nash | X | X | X | X | X | X | X | X |
| Average Joe's Archery | Joe Caminati | | | | | | | X | X |
| Bass Pro Shops | Darren Hogan | X | X | X | X | X | X | X | X |
| Butch's Sports World | G.C. "Butch" Herold | | | X | X | | | | |
| Central Cascades Archery | Al Barton | | | | | | | X | X |
| Cimmarron | Peter Gussie | X | X | X | X | | | | |
| Dead-On Archery | TJ Hofhines | X | X | X | X | X | | | |
| Jay's Sporting Goods | Mark Copeland | X | X | X | X | X | X | | |
| La Crosse Archery | Laura Rosenthal | X | X | X | X | X | X | | |
| Korbin's Archery | Korbin Williams | | | | | X | X | X | X |
| Lancaster | Chris Scott | | | | | X | X | X | X |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **M&M Archery Range** | Krysta Wright | | | X | X | X | X | X | X |
| **Music City Archery** | Jeff Greer | | | X | X | X | X | X | X |
| **Scheel's** | Rod Hartl | X | X | X | X | X | X | X | X |
| **Weaver's Archery** | Keith Weaver | | | X | X | X | X | | |
| **Wyvern Creations** | David Wilkins | X | X | | | | | | |
| **X10 Archery** | Lynda Whitehead | | | | | | | X | X |

### c)    *Trade Show*

70.    The ATA hosts an annual Trade Show—open only to ATA members—that is widely attended by these would-be horizontal competitors. At the 2016 ATA Trade Show, for instance, "every major bow manufacturer was present and accounted for."

71.    MAPs are heavily discussed at the ATA's annual Trade Shows. At the 2015 ATA Trade Show, "[a]bout 60 representatives of ATA-member manufacturers, distributors and retailers attended [a] meeting to review a sample MAP/MPR policy[.]"

### d)    *ATA Connect*

72.    In 2017, the ATA created a members-only forum called "ATA Connect," which, the ATA described as an "online discussion community created exclusively for ATA members" and "a safe, confidential space to network and solve industry challenges through constructive discussions." As the ATA explained, ATA

Connect "was conceived by ATA staff and the ATA's Retail Council," as "the first members-only forum for archery-industry professionals to discuss hot topics among themselves – and work together to find solutions." One ATA senior director expressed her pride in the launch, explaining that "[f]acilitating honest and open conversation in a members-only setting will help [] members discover new ideas and, hopefully, grow their businesses."

73.     At all times relevant to this Complaint, ATA Connect contained at least two members-only sub-communities: First, the MyATA Network, which could be accessed by all ATA members, regardless of their membership type; and second, the Retail Growth Interact community, which was "exclusive to ATA-member retailers." According to the ATA, the Retail Growth Interact community allowed ATA retail members "[t]o communicate with other retailers and learn how they stay ahead of the learning curve," as "a confidential space for retailers to network and find solutions to business challenges through constructive discussions." In particular, the ATA has explained to retail members: "***Retail Growth Interact is a great place to share ideas and ask questions*** about the topics that matter most to your business, including buying patter[n]s, ***profit margins and what to charge for services***." In addition, on ATA Connect, members could access various resources, such as member and company directories.

74.    At all relevant times relevant to this Complaint, the ATA sent its members to ATA Connect to coordinate on MAP. In 2019, for example, the ATA updated its website to urge its members to use ATA Connect to "discuss MAP with [their] peers":



75.    The ATA has also urged its members to use ATA Connect to "find solutions that boost business and benefit the industry by tackling topics like MAP policies[.]" Further, the ATA has specifically sent its retail members to the Retail Growth Interact Community on ATA Connect to discuss "topics like MAP policies" within "a safe online space."

C. **Defendants' Conspiracy**

76.    As set forth herein, an ongoing subject of concern to ATA members in recent years has been retail price competition for Archery Products, which the ATA and Defendants began to view as an existential threat to the industry beginning no later than 2014. To address this issue,  the ATA, as well as its retailers, encouraged,

directed, and facilitated communications among and between ATA members—who historically competed with one another—to agree upon a common course of action to lessen retail price competition on Archery Products. Ultimately, the ATA and Defendants agreed to work together to adopt and implement industry-wide MAPs on Archery Products sold in the United States with the objective of artificially fixing, raising, maintaining, or stabilizing prices on Archery Products.

77.     In furtherance of this conspiracy, the ATA organized various meetings and programs for its members at which they discussed and agreed upon strategies to ensure the success of their anticompetitive plot, including sample MAP policies; best practices for MAP policies; desired retail price margins for the ATA's retailers; and how to work together to police non-complying retailers, including by jointly agreeing to restrict violating retailers' supply of Archery Products.

78.     The goal of Defendants' conspiracy was to artificially raise the retail price for Archery Products in the United States. This conspiracy was successful, and Plaintiff and the Class have paid supra-competitive retail prices as a result.

### a) ATA Members Grow Increasingly Concerned by Growing Retail Competition

79.     The ATA and its members, in particular the retailers, began to express concern about retail price competition on Archery Products beginning in the early-2000s and through the 2010s. As these concerns persisted, ATA members began

discussing MAPs as a way to raise the price on Archery Products. While some MAPs already existed within the Archery Products industry in the early-2000s, they were far from prevalent.

80.     At least initially, the disorganized manufacturers, distributors, and retailers of Archery Products lacked consensus on whether or how to address growing retail price competition. Some manufacturers supported the adoption and aggressive enforcement of MAPs, but only if other manufacturers adopted MAPs as well. Collective enforcement would be needed because manufacturers without MAPs could take market share from competitors with MAPs. Retailers, in turn, could offer the Archery Products of manufacturers without MAPs at lower prices than the Archery Products of manufacturers with MAPs.

81.     In September 2010, the President of the National Archery Buyer's Association lamented the absence of unity among manufacturers, distributors, and retailers to *Inside Archery*, a publication geared toward the Archery Products supply chain: "Frankly many manufacturers don't have a clue about minimum advertised pricing and why the industry needs it to survive. Consequently, we don't have much conformity in our industry."

82.     As a result of this lack of consensus, retail price competition for Archery Products remained robust through the early 2010s. Industry members

showed increasing interest in expanding MAP policies to curb price competition, but the ATA and its members privately worried that industry-wide MAP adoption, implementation, and enforcement could subject them to antitrust liability. An article in the September 2010 edition of *Inside Archery* noted that, "[a]lthough some manufacturers and retailers ask the [ATA] to step in and make dealers and online retailers adhere to MAPs, that would exceed the ATA's authority," with one member of the ATA's Board of Directors stating: "There's nothing the ATA can legally do when it comes to enforcement. There's no rule the ATA can set down and say 'This is what you must do.'"

> **b)** ***The ATA Takes Action, Coordinating an Agreement to Artificially Fix, Raise, Maintain, or Stabilize Prices for Archery Products Sold in the United States***

83.     Lacking a clear path to consensus, retail price competition for Archery Products continued into the mid-2010s. Archery Products retailers, however, maintained pressure for industry-wide action. That pressure campaign reached a critical pitch in 2014, with the addition of some of the largest industry retailers to the ATA Board: Defendants **Cabela's** and **Bass Pro Shops**. Soon after, the ATA finally began to take action to organize and facilitate industry-wide adoption, implementation, and enforcement of MAPs on Archery Products sold in the United States. The ATA gathered and disseminated information about MAPs to ATA

members, provided sample MAPs, and encouraged members to exchange information about MAPs and desired profit margins. All of these actions were taken with the goal of artificially fixing, raising, maintaining, or stabilizing prices on Archery Products for consumers.

84.     The ATA memorialized its initial coordinating efforts in a since-deleted December 31, 2014 communication to its members titled "***MAP: United We Stand, Divided We Fall***." In this message, the ATA's former CEO and President, Jay McAninch ("McAninch"), reflected on the ATA's interest and new efforts to pursue industry-wide MAPs as a solution to retail price competition for Archery Products:

> I believe to deal with this MAP issue, our industry must hold an open, honest dialogue about it. ***Everyone must participate*** because if we don't address the damage to our business model, we risk losing in the long term the sustained growth we've enjoyed. Since this involves everyone the ATA is the right group to facilitate this discussion and provide the vehicle ***for the industry to unite*** behind constructive, positive changes.
>
> To ensure the industry addresses these issues, we've engaged the ATA Board of Directors; and the leaders of ARRO, NABA, NBS and Sports Inc. We've also included manufacturers and distributors who expressed interest in MAP. ***In the months ahead, we'll facilitate a dialogue that examines what our industry's business leaders think can and should be done about MAP***. To that end, the ATA will offer our MAP policy as a template that companies can use as a tool if they take action.
>
> ***We can't solve industry problems until we involve***

> *everyone in a conversation that shares concerns and develops a course of action.* This first step basically "turns on the lights" because it requires everyone to share what they think about this issue's impacts on our industry. Once we have a clear sense of what MAP is about for ATA members, we can start a process that deals with it.

85.     Looking back at the consequential decision to add Defendants **Bass Pro Shops** and **Cabela's** to the ATA's Board of Directors, the ATA's McAninch remarked:

> In 2014 the "box stores" were voted onto the ATA [Board of Directors] . . . . Cabela's and Bass Pro Shops joined us at our January, 2014 meeting. As I look back on the first year of the *mega marts joining into our industry discussions*, I have to say that if anyone other than [Cabela's] Tom Gallagher had been involved, we would not have had such a smooth and productive first year. With his *cohort in crime*, [Bass Pro Shops'] Dean Snelson, Tom quietly and in his unassuming, disarming way (which is his manner) allowed our Board members to see that *the box stores shared in our future and, more important, were serious about contributing to the success of the archery and bowhunting industry*.

86.     On January 10, 2015, at the ATA Trade Show, "[a]bout 60 representatives of ATA-member manufacturers, distributors and retailers attended [a] meeting to review a sample MAP/MPR policy[.]" The ATA's McAninch explained that "companies [could] use the sample policy as a starting point in crafting customized policies to protect each product's publicly advertised minimum price." McAninch made himself available to provide more information about

MAP/MRP policies in case ATA members had further questions.

87.     Shortly after that meeting, the ATA further intensified its efforts in furtherance of coordinating industry-wide MAPs, tweeting, "Three steps to developing a sample Minimum Advertised Price policy," which linked to a now-deleted article titled, "ATA Helps Members Develop MAP Policies":



88.     In that article, the ATA reflected on the January 10, 2015 meeting, and explained that "[i]f ATA members want to control the minimum advertised price (MAP) . . . of their products, each business **_must_** create its own policy statement, issue it to all resellers, and then **_enforce it consistently and forcefully with no negotiations_**." The ATA urged its members "to contact McAninch . . . [f]or more information about MAP/MRP policies."

89.     The efforts by the ATA, led by retailer members, were effective. For example, in June of 2015, distributor Defendant **Kinsey's** announced its adoption of a "new Minimum Advertised Price (MAP) policy" to "clarif[y] how they are

38

working to ensure retailers comply with manufacturers' advertising and marketing guidelines." Commenting on this announcement, Kinsey's shared its support for "manufacturers in the implementation of MAP policies to protect the interests of their brands, as well as margin integrity within the retail network."

90.     Notably, the industry-wide adoption, implementation, and enforcement of MAPs, after Defendants made their agreement, involved the active participation of Archery Products distributors. Many smaller archery equipment retailers purchase from distributors, as opposed to directly from manufacturers. As a result, manufacturers reached an agreement with distributors such as Defendant **Kinsey's** to assist in the policing of the manufacturers' MAPs. Randy Wood, VP of Sales for a manufacturer called TenPoint, commented on Kinsey's support in 2015: "Kinsey's has done a great job of backing TenPoint's enforcement of its MAP policy, thus strengthening the TenPoint brand as well as helping the retailers maintain a solid profit margin."

91.     Remarking on these coordinated efforts, one Archery Products retailer noted in a June 2015 post on a popular industry forum, *Archery Talk*, that he hoped the ATA and its members would be "successful in establishing ***an industry wide rule set that will [also] be enforced industry wide***."

92.     Looking back on these efforts, in a since-deleted March 15, 2016 article

on the ATA's website, titled "ATA Members Weigh in on MAP," the ATA wrote: "More than one year later, there's still good news and bad. However, the ATA and its member companies have worked tirelessly to discuss, craft and enforce MAP policies that could help manufacturers, retailers and the industry."

93.   In that ATA article, Mike Ellig ("Ellig"), founder of a manufacturer called Black Gold, reflected: "[I]n 2014, I spoke with Jay McAninch about creating a MAP policy . . . . I was ready to charge ahead, but as a small-business owner, I didn't know where to start and I didn't have two months to create a policy from scratch." The article continued, "Black Gold's MAP policy has been in place about two years. Ellig said he notices more companies adhering to the MAP policy, and also has 'cut off' people who wouldn't abide by it." Ellig concluded that "'[i]t takes extra effort to get a MAP policy right, but the long-term impact of doing it right is 10 times greater than the short-term impact of getting the sale.'"

94.   Also in the ATA article, Marty Stubstad, former owner of Archery Headquarters and president of an archery retailer group called ARRO, explained that "many dealers might not know how to price certain products, but MAP helps them learn what profit margin they need to make their business survive." Reflecting on the benefits of MAPs, he urged manufacturers to "approach this problem like it's enforceable and be determined to enforce their policies."

95.     In that same ATA article, Ben Summers, Director of Operations for a manufacturer called T.R.U. Ball Archery and then-Chairman of the ATA Board of Directors, claimed that "one of the most valuable takeaways ATA has provided its members is the importance of handling MAP issues through the proper channels." He also explained why it is important that MAPs are implemented industry-wide: "If I'm really good at keeping my products at the MAP price, and I have a competitor who isn't keeping a MAP policy, and their product costs less than mine, I can lose lots of sales." Summers further stressed the importance of enforcing MAP policies: "If you have a MAP price structure, you must be smart and proactive about going out and finding people who break your MAP policy."

96.     Bruce Hudalla, from Hudalla Associates, which "helps manufacturers with MAP policies, and also tries to ensure retailers follow MAP policies," similarly stressed the importance of collective enforcement: "If you have a policy, it must be enforced." He also observed, with respect to the ATA's efforts, that it did "an excellent job getting all the main players from retailers to manufacturers to sales reps in the same room and presenting the facts and sample policies[.]"

97.     Finally, in this same article from the ATA, Jay Scholes ("Scholes"), co-founder of an outdoor industry sales and marketing firm called OutTech, offered: "We're responsible for upholding our sport, for making sure our retailers make

money, and ensuring manufacturers also make money. MAP is a good thing for our industry." Like the others, he complimented the ATA for its efforts: "He commended McAninch and ATA staff for facilitating conversations between retailers and manufacturers, and for cutting through misinformation about MAP to present the truth." And Scholes concluded, "If we all believe we're in this business because we love the outdoors, we have a responsibility to uphold MAP to strengthen the industry[.]"

98.    In short, bowing to the coordinated pressure campaign from retailer members, the ATA facilitated a retail price fixing conspiracy.

### c)    *Defendants' Conspiracy, Facilitated by the ATA, Gains Momentum*

99.    Defendants' agreement to artificially fix, raise, maintain, or stabilize the prices of Archery Products resulted in a coordinated push for industry-wide MAP acceptance, which gained momentum into 2016. At the ATA Trade Show that year in Louisville, Kentucky, attendees discussed the need for industry unity on adopting, implementing, and enforcing MAPs. For example, one attendee remarked: "***The archery industry is uniting as one***, understanding that we are all in this together, and that that ***unity is ultimately what will help us grow***."

100.    The President of ARRO, an archery retailer group, presented at the 2016 ATA Trade Show about increasing ATA retailers' profit margins through MAP

enforcement by manufacturers, and MAP adherence by retailers. As the ARRO President later explained, "We have to educate our dealers about holding to the MAP as much as they can" while "[m]anufacturers must approach this problem like it's enforceable and be determined to enforce their policies." ARRO's President identified the ATA as the key mechanism to achieve these ends, stating, "It will take the ATA's power to educate retailers and manufacturers about the importance of upholding MAP policies."

101.    Shortly after the 2016 ATA Trade Show, on March 15, 2016, the ATA published and posted the above-cited article, titled, "ATA Members Weigh in on MAP":



102.    In the article, the ATA also directed "Members Interested in MAP Policies" to contact the ATA "for resources about creating a MAP policy for [their] company," explaining: "[These] resources are available only to ATA members, and are included in your membership."

103.   In May of 2016, the ATA held a strategic planning meeting in Minneapolis, Minnesota, to discuss their mutual business interests. As a result of this meeting, the ATA's Board of Directors reinstated its Retail Council, to "improve the industry's archery and bowhunting markets." The new Retail Council gave retailers additional influence and power over ATA decision-making. Mark Copeland, general manager of Defendant **Jay's Sporting Goods** and the chair of the Retail Council, described the increased role of retailers in the ATA: "We've needed an active and engaged platform for retailers to discuss important issues where the conversation is educational and productive . . . . I'm appealing to every archery retailer to use our backbone to step up and be part of the solution."

104.   In July of 2017, the ATA Board of Directors voted unanimously to add seats to the Board for two Archery Products retailer trade associations—NABA and ARRO—giving these associations "a direct voice in ATA matters." The ATA touted that these additions would "give industry representatives from all areas more chances to work together to strengthen the industry." The decision was made at the headquarters of Defendant **Hoyt**, a Utah-based manufacturer, and resulted in a Board composed of "three pro shops, two buying groups, one sales representative, two multi-channel retailers, and 12 archery and bowhunting manufacturers and distributors." Remarking on this decision, NABA's President, Gary Kinard, noted

his hope that NABA's seat on the ATA Board of Directors would "improve communication between dealers and manufacturers." ARRO's executive secretary, Deb Colgrove, similarly remarked that the ATA had "been working to help retailers be more profitable" in recent years, and that she hoped ARRO's Board seat would "strengthen[] the relationship and communication between ARRO, ATA[,] and manufacturers." The day after this vote was announced, the ATA posted on its Facebook page, "How do MAP Policies impact our industry's long-term success? Find out," and linked to a now-deleted article on its website titled, "MAP: What is it? Why Does it Exist?":



105.    In that article, the ATA urged its manufacturer members to adopt, implement, and enforce MAPs and encouraged its retailer members to also urge

manufacturers in this regard. In particular, the ATA asked retail members to "follow[] good MAP policies, which means those enforced by manufacturers." The ATA added, "When you're part of the solution, you'll make more money." In addition, the ATA told its retail members: "If a manufacturer doesn't have a policy, or doesn't enforce its policy, call the company and express your concerns. Encourage them to work with the ATA to develop a MAP policy or improve their current policy." Kurt Smith, the ATA's senior manager of retail programs and a member of the ATA Retail Council, likewise "encourage[d] retailers to request MAP policies from manufacturers, and open the lines of communication. Then, adhere to those policies and improve the archery and bowhunting industry's long-term success." In the article, one ATA Retail Council Member urged manufacturer members to "create MAP policies" while urging retail member to "honor them," and explaining that "every business in the industry must work together as a group to be productive and profitable, which includes strong MAP policies and procedures."

106.    The ATA also explained the benefits of MAPs for the industry: "These policies level the playing field for all retailers, and eliminate the 'race to the bottom' that would occur if retailers endlessly competed to reduce prices." Similarly, the ATA explained that "MAP . . . policies help retailers stay in tune with the market and margin expectations. In other words, *if you understand and follow a*

***manufacturer's MAP policy, you'll be better positioned to make more money*** and run a successful business." Further, the ATA made it clear that it "is here to help" with respect to MAP policies and once again explained that it "works with manufacturers to establish and enforce good MAP policies, [who] can get involved in several ways."

107.    In October 2017, the ATA posted on Facebook and Twitter, "What's MAP? We're educating retailers and manufacturers, and helping them grow their #bowhunting business," linking to a now-deleted webpage on the ATA's website titled, "ATA Launches MAP Resource Library for Members":





108.    On that website, the ATA explained to its members how its MAP

Resource Library and the association more generally can assist with MAP policies:

> If Minimum Advertised Pricing concerns your business –
> and it should – ***the Archery Trade Association offers
> resources to help ATA members comply with MAP
> guidelines***.
>
> ***ATA staff are compiling manufacturers' MAP policies
> and posting them in the Members-Only area of the ATA
> website.*** This MAP Resources Library helps retailers learn
> which manufacturers have MAP policies, and helps
> retailers to understand and comply with them. Several
> policies are already posted, and the ATA will add more as
> manufacturers provide them.
>
> ***If you're a manufacturer and need help monitoring how
> well retailers adhere to your MAP policy, the ATA can
> help you, too.*** MAP policies are only effective if they're
> enforced, but monitoring and enforcing them can be

challenging. ***To help, ATA has secured special discounts
with firms that monitor and enforce MAP policies. These
discounts are available only to ATA-member
manufacturers***.

***The ATA has asked all ATA-member manufacturers to
provide their policies so they can be included in the MAP
Resource Library.*** If your company has a MAP policy, or
if you have questions, contact Wendy Lang, ATA
membership manager, at wendylang@archerytrade.org.
To capitalize on these ATA-member benefits, join the
Archery Trade Association today.

109.    A month later, in November 2017, the ATA launched a members-only

forum called "ATA Connect," which the ATA touts as an "online discussion

community created exclusively for ATA members" and "a safe, confidential space

to network and solve industry challenges through constructive discussions." For the

launch, the ATA tweeted: "Retailers, are you looking for a place to talk shop? Check

out ATA Connect, a new forum just for industry professionals," linking to a now-

deleted article on the ATA website, titled "ATA Retailers: Explore ATA Connect

[to] Find Business Solutions":



110.    In the linked article, the ATA urged its members to use ATA Connect to "work with [their] peers to find solutions that boost business and benefit the industry by tackling topics like MAP policies, buying patterns, and setting appropriate charges for service work." When it launched ATA Connect, the ATA also highlighted the "Retail Growth Interact community within ATA Connect[, which] was created specifically for ATA-member retailers, and provides a safe online space for discussing topics like MAP policies[.]"

111.    The ATA continued its efforts in coordinating the industry-wide adoption and implementation of MAPs on Archery Products. For example, the ATA's website was updated no later than September of 2018 to remind manufacturer members: "[T]he ATA will work with you to develop a MAP policy." In November 2018, the ATA posted a video on Facebook with the caption: "Did you know the ATA has services to help your business with Counterfeiting, the Federal Excises Tax, and Minimum Advertised Price? Watch this video to learn more!":



112. In the video, the ATA referred its members to the MAP resources on the ATA website, including the "MAP Library," a "List of Manufacturer MAP Policies," "Education on MAP," and "ATA Staff Support":





> **d)**   **With Industry-Wide Adoption and Implementation of MAPs on Archery Products, Defendants Stress Industry-Wide Enforcement In Furtherance Of Their Agreement**

113.   Having successfully recruited a critical mass of Archery Product

manufacturers, distributors, and retailers to adopt and implement MAPs, the ATA, in furtherance of their price-raising agreement, pushed its members to collectively enforce the industry-wide MAPs. The ATA's efforts took the form of both enabling enforcement, as well as stressing the critical importance and required collective aspect of that enforcement, to its members.

114.    By 2017, the ATA had already built a relationship with Defendant **TrackStreet**, digital platform to track and enforce pricing policies. In January of 2017, TrackStreet representatives attended the ATA Trade Show, and sometime after, TrackStreet's Ryan Erickson ("Erickson") traveled to an ATA meeting in Wisconsin where he met with the Board of Directors.

115.    As discussed above, the ATA launched its MAP Resource Library in October 2017, to "help retailers to understand and comply with [MAP policies]." Shortly after launching this library, the ATA began offering special discounts to manufacturer members to use firms such as Defendants **TrackStreet** and **Oris** for monitoring and enforcement of MAP policies. On its website, announcing the launch of the MAP Resource Library, the ATA notified its manufacturer members: "MAP policies are only effective if they're enforced, but monitoring and enforcing them can be challenging. To help, ATA has secured special discounts with firms that monitor and enforce MAP policies. These discounts are available only to ATA-

53

member manufacturers."

116.    In December 2018 at the latest, the ATA updated its website to include a specific prompt for the ATA's manufacturer members to send the ATA their MAPs to load onto the members-only "resource library," and cautioned the ATA's retailer members that it was their "responsibility to know MAP policies and follow them":





117.    Through numerous posts, articles, and podcasts in 2019, the ATA continued to stress the importance and required collective enforcement aspect of MAP enforcement. For example, in a January 12, 2019 tweet and Facebook post, both shown below, the ATA compared MAP enforcement to "hunting coyotes" in a "the season never ends":





118.    In the linked article, titled "Effective MAP Programs Mean Nonstop Enforcement," the ATA "urge[d] retailers and distributors to notify manufacturers of [MAP] violations, and provide as many specifics as possible," and explained: "The big thing will always be communication and teamwork . . . . Enforcing MAP will never get easier. That's why ***it's so important for ATA members to work together as much as possible***."

56

119.   In the article, the ATA repeatedly pushed for collective MAP enforcement, including by noting the following: "MAP policies require vigilant enforcement, which means good communications between manufacturers, distributors and retailers"; "The manufacturers' customers must know the companies' MAP policies, follow them, and help police them"; "If a company creates a good partnership with its distributors and retailers to catch violators, it can cut them out of the supply chain and force them to look for easier prey"; that manufacturer T.R.U.'s Vice President, Ben Summers, attributes its "really high" sales in 2018 to MAP and that Summers "discusses MAP policies regularly with retailers and distributors"; that manufacturer TenPoint's Customer Relations and Training Director, Barb Terry, "encourages its retailers to be MAP watchdogs" because "[s]maller dealers can't compete with people who drop their prices below MAP," and that "[i]f they notify us, we'll follow up on it" because "[w]e don't want to see someone take money out of our customers' pockets."

120.   Per the ATA's instruction, both distributors and retailers have participated in the enforcement of MAPs. Specifically, ATA retailer members make efforts to withhold patronage from manufacturers who do not adopt or enforce MAPs and to instead deal with manufacturers who do adopt and enforce MAPs. The ATA retailer members publicly discuss those efforts as well. According to one ATA

manufacturer member: "We actively police our MAP, and we think it works. When dealers talk to us at the ATA Show . . . , it's clear they're making buying decisions based on how we enforce our MAP." Likewise, retailer Weaver's Archery has publicly stated that it "discontinue[d] stocking manufacturers who do not have MAP policies and don't enforce them[.]" Retailers have also informed manufacturers of other retailers' MAP violations.

121.    Recognizing the importance of collective enforcement and the need for coordination among all industry players, in March 2019, the ATA once again strongly pushed for collective enforcement and policing of their members' MAPs, including through Defendant **TrackStreet**. On March 11, 2019, the ATA's new President & CEO, Matt Kormann ("Kormann") joined an episode of industry podcast *Bowjunky*, in which he discussed MAP monitoring and enforcement using TrackStreet. On the podcast, the host noted that he had seen several releases and posts from the ATA on MAP pricing and TrackStreet. Kormann replied, "TrackStreet has been a huge win for our manufacturing members who have chosen to work with them." Kormann then provided an example of a manufacturer ATA member who used TrackStreet to significantly decrease MAP violations and explained that not all manufacturers could afford to hire someone to enforce their MAPs. This made TrackStreet "a huge win." Kormann also suggested that the

*Bowjunky* podcast invite a representative from TrackStreet onto the program to discuss MAP enforcement.

122.    The ATA promoted this *Bowjunky* podcast interview on its Facebook page:



123.    Per Kormann's suggestion, later that month, the *Bowjunky* podcast hosted TrackStreet's Erickson. During the episode, the podcast host explained that the ATA had endorsed and informed ATA members about TrackStreet. Erickson then stressed the importance of enforcing MAPs, saying, "[T]he only thing worse than not having a MAP policy as a brand is having one and not enforcing it." He continued, "***[W]e have all agreed this is the right thing***, so now we have to finish this up."

124.    The ATA again promoted this podcast on Twitter:



125.    On March 20, 2019, the ATA hosted TrackStreet's Erickson on its own podcast, called *Beyond the Bow*, in an episode titled, "MAP Policies & Enforcement." Kurt Smith, the ATA's senior manager of retail programs and a member of the ATA Retail Council, hosted the program. Smith introduced the topic of MAPs as "probably one of the most talked about topics in the archery industry." During the conversation, on several occasions, Erickson stressed the importance of reaching a critical mass of manufacturers to adopt, implement, and enforce MAP policies: "[E]ach individual brand has to be on the same page . . . . [A]t the founding of our country, Bemjamin Franklin said we must all hang together most assuredly we'll hang separately." Along the same lines, later in the podcast, Erickson

explained, "[N]obody wants to be the first soldier through the wall . . . . [T]hey tend not to turn out too well . . . . [But] *as soon as a couple big brands hop on, then all of a sudden that provides an umbrella coverage for the rest of the brands to move forward*." Erickson repeatedly noted the critical importance of the ATA's work aimed at reaching this critical mass: "[T]he work that the ATA has done for the industry itself . . . I would say is unparalleled in terms of the efforts that the ATA is making."

126.    The next day, the ATA promoted this podcast on both Twitter and Facebook:





127.   Defendant **Kinsey's** further explained: "When someone breaks the rules [of the MAP policy], they lose the ability to buy that product from us. They also can't buy it online or through the manufacturer because we work closely with our vendors to build a 'do-not-sell' list."   Kinsey's also explained this on their website in 2019: "[MAP] is the price set by the manufacturers not to be undersold. It is the dealer's responsibility to make sure you are at or above MAP on various products . . . . If your company has fallen below MAP prices, you will be restricted from purchasing these products from Kinsey's South effective *immediately*." A market participant, quoting this language on a public forum, noted, "Every company that I have had dealings with, has a similar disclaimer." Another industry insider offered, "Quite a few dealers have found out their sources simply will not sell to them after violating MAP." And an Archery Products retailer added, "[M]anufacturers commonly have MAP pricing we must abide by in order to maintain dealership status."

e)    *By 2020, Defendants' Efforts Become More Covert, But Their Competitor-Facing Assurances of Continued Compliance to Industry-Wide MAP Continue*

128.    Beginning in or around 2019, the ATA and its members became increasingly concerned that the success of their price-fixing agreement would draw legal scrutiny. To that end, starting sometime after June of 2021, the ATA began scrubbing its website of nearly every reference to its central role in the conspiracy. It also began encouraging ATA members to *call* to discuss MAPs, as reflected in a May 7, 2020 article in *Hunting Retailer*, a publication for hunting equipment retailers: "What do archery retailers love more than archery? A successful business. And money . . . . ATA's Kurt Smith, director of industry relations, and Nicole Nash, manager of retail programs, can help by providing tips on what your plan should entail . . . . Remember to adhere to minimum advertised price policies on items you sell. To ensure you understand MAP policies, contact the ATA's business office at (507) 233-8130."

129.    Defendants' employees also began using interviews with trade publications and the ATA to reiterate their commitment to the success of the conspiracy to their would-be competitors. In this way, these interviews fortified the conspiracy and agreement, which was now operating as business-as-usual for the industry.

130.   As an example, the August 2019 edition of *Inside Archery* noted: "Kinsey's is using its far-reaching influence to help enforce MAP policy. This effort is also geared towards helping dealers and strengthening the industry at large." Justin Gorman, Defendant **Kinsey's** Director of Sales, was also quoted at length:

> We work closely with our vendor partners and retail partners to monitor and enforce MAP policy. There are a lot of methods out there, and there really is no simple solution, ***but by working together***, we have the ability to bring positive change to the industry. Kinsey's has a very up-to-date and sophisticated warehouse management system, and it allows us to automatically restrict sales to shops that violate MAP. It's not something we need to remember to jot down on a notepad, it's programmed into the system . . . . Kinsey's certainly can't solve this problem by itself. Everyone needs to pull their own weight, but we are doing all we can to help protect the honest shops that don't violate MAP, which are the shops that actually get hurt when someone else breaks the rules.

Similarly, the December 2019 edition of *Inside Archery* reported that Victory Archery "spends a great deal of time and energy to enforce MAP pricing[.]" The quote from Kinsey's Justin Gorman, and the information about Victory Archery, were again included in the January 2020 edition of *Inside Archery*.

131.   The March 2020 edition of *Inside Archery* quoted David Kronengold, former General Manager of Defendant **PSE**, who shared: "The industry is in a hard place, but we are not going to wait for anyone else to fix it for us. We are going to

make it part of PSE's business strategy to drive improvement and fix everything we can. ***And we are doing all of this while fully acknowledging that if we are successful, then we are also benefiting our competitors***."

132.   As a further example, the December 2020 edition of *Inside Archery* quoted Phaen Pittman, the Manager of the retailer Performance Archery, who offered: "The purchasing side is where we put a major emphasis on who we do business with and why . . . . We're constantly researching to find the best products, backed by companies with strong MAP policies and good dealer margins."

133.   And as yet another example, in a now-deleted 2021 post on the ATA website, MWS's Vice President, Bill Goodreau, and President, Kurt Bassuener, communicated to ATA members: "We're all competitors, and we compete against each other throughout the season and the years. But we must grow the [participation] numbers in the industry, and to do that we must work together . . . . Realistically, the ATA does so much for the growth and health of the industry, and I think that largely goes unrecognized. Although we're all competitors in the industry, we all have the same goal, and that's to help the industry succeed. The ATA works on that, and reminds us to see the bigger picture."

**f)   *Defendants' Conspiracy Continues Through the Present***

134.   Defendants' conspiracy to artificially raise prices through the adoption,

implementation, and enforcement of industry-wide MAP policies on Archery Products continues through the present. The ATA continues to offer "to work with [its manufacturer members] to develop a MAP policy." It continues to "advocate for [its members] on issues like . . . minimum advertised pricing." And it continues to publicly endorse MAP policies and promote their enforcement. In particular, the ATA continues to offer its members "discount programs so ATA members can hire outside vendors that use 'web crawlers' and other high-tech software to scour the internet for MAP violators." Defendants and co-conspirators continue to use MAPs and advertise products under MAPs, including in popular industry publications like *Inside Archery*. And Defendants and co-conspirators continue to express and signal to one another their continued commitment to the price-fixing agreement. For example, Steve Greenwood, General Manager at Victory Archery assured others in the January 2023 and January 2024 editions of *Inside Archery*: "We police MAP 24/7."

135.  Additionally, the effects from this price-fixing agreement are still being born by Archery Products consumers today, who pay artificially higher prices on Archery Products.

## D. **Defendants' Conduct Has Had Anticompetitive Effects**

136.  Courts have consistently and without deviation adhered to the principle

that agreements between horizontal competitors to artificially fix, raise, maintain, or stabilize prices are *per se* unlawful. Here, Defendants agreed to fix, raise, maintain, or stabilize prices through MAP policies, resulting in consumers paying artificially inflated prices and supra-competitive profits to Defendants. Industry-wide MAPs restrict competition and increase retail prices through at least two mechanisms. First, by eliminating the ability of competing retailers to attract customers by publicly advertising lower retail prices, MAPs reduce retailers' incentives to compete on price because those lower prices do not entice incremental business to shop at the retailer. Second, whatever limited incentives to offer discounts on retail prices remain after MAPs are adopted and enforced, MAPs set an artificially high retail price from which price negotiations are initiated, ensuring that actual transaction prices will be higher than would otherwise be the case.

137.   The Defendants' agreement to artificially raise prices through the adoption, implementation, and enforcement of industry-wide MAPs is therefore an agreement that has fixed, raised, maintained, or stabilized the retail prices of Archery Products sold in the United States.

138.   The ATA admits that MAPs restrict competition and affect retail prices. According to the ATA: "A MAP policy ensures all retailers compete fairly and evenly on service instead of price"; "[MAP] policies level the playing field for all

retailers, and eliminate the 'race to the bottom' that would occur if retailers endlessly competed to reduce prices"; "MAP policies help small businesses compete and sell on service and value, rather than waging price wars with other retailers."

139.    ATA members also admit that MAP policies affect retail prices. According to one ATA member: "MAP is a good thing for the archery industry" because "[i]t keeps a level playing field and allows people to compete on product knowledge and customer service" rather than on price. And NABA has stated that its members "strive for a minimum of 40% profit based on manufacturer's M.A.P. (Minimum Advertised Price)." Another retailer shared: "[M]ost archery shops are in areas where bow pricing is highly competitive from shop to shop. We all want to get the sale, but fortunately manufacturers set MAP pricing on bows, which mostly prevents one shop from grossly undercutting another on pricing. ***That way, we all get our piece of the pie***."

140.    Other industry players have also recognized that MAPs artificially fix, raise, maintain, or stabilize retail prices on Archery Products. For example, in a 2016 post on *Archery Talk*, an online forum, an Archery Products retailer observed:

> Every dealer I have ever talked to thinks everything in archery is overpriced today, just as I do! Today vertical bows are exceeding [$]1000 - 1500 on a regular basis, a dozen crossbow arrows are over $80 and can cost up to 250 if you want custom work, firenock arrows are over $600 a dozen, vertical arrows are exceeding $200 for

hunting arrows, dont get me started on target arrows, X10
Pro Tours are over $400 for bare shafts, points can be
around $300. The average pay hasn't moved much in years
[ . . . ] is archery overpriced, absolutely.

141.    Various posts in *Archery Talk* have similarly acknowledged that MAPs

have been used as agreements to artificially fix, raise, maintain, or stabilize retail

prices. Archery Products retailer Wyvern Creations, for example, offered:

Many MAP agreements state that you are more than able
to sell below MAP but if you do you will simply not be
allowed to sell the product. Quite a few dealers have found
out their sources simply will not sell to them after violating
MAP. ***The reality is that many MAP agreements
(Scorpyd or Tenpoint for example) are actually MRP
(minimum retail price).***
. . . .
***The big mistake here is that in many instances MAP
DOES limit the actual selling price if the dealers want to
continue to sell the product.*** The attitude (and basically
what is in the agreement) from the manufacturers is that
'you can sell for whatever you want [] but I don't have to
sell my product to you if you choose to do so." Consumers
generally don't like it [because] they feel the 'bottom line'
should be fluid and the 'race to the bottom' is how dealers
have to compete. ***Dropping your price is the easiest and
worst way to compete***.

142.    Consumers regard archery equipment prices as inflated. In 2017,

published reports explained that consumers regarded compound bow retail prices as

"obscene," "out of touch," and "insane." Nevertheless, the article noted that "with

fewer sales, many dealers have demanded better profits" and quoted a founder of

one bow manufacturer as saying, "Used to be dealers were happy to make $150 on a bow . . . . Now many of them want $250 or more. It's tough. The whole industry is trying to figure out what to do next."

143.    Indeed, economists view MAPs as even more effective at facilitating cartel outcomes than MRP/RPM policies, which institute price floors on end sales prices as well as advertised prices:

> MAP policies can allow a manufacturers' cartel to attain greater surplus extraction than a cartel that does not use MAP or RPM and strengthens the dynamic incentives that give the cartel stability. As such, in this setting with search frictions, **MAP appears to be a more effective cartel facilitation device than RPM**.

## VI.    THE RELEVANT MARKET

144.    Defendants' price fixing agreement is unlawful under the *per se* standard, which does not require relevant market definition.

145.    To the extent definition of a relevant geographic market is legally relevant in this action, the geographic market is the United States.

146.    To the extent definition of a relevant product market is legally relevant in this action, it is Archery Products. Archery Products refers to products used by consumers for bowhunting or archery. For purposes of this action, Archery Products consists of five main product markets, submarkets, or cluster markets: (1) bows—including compound bows, recurve bows, longbows, and crossbows—and their

components; (2) arrows (minus the arrowhead) and their components, including the shaft, fletching, and nock;  (3) arrowheads (or arrowpoints) including broadheads and field points; (4) targets, including bag targets, foam targets, and 3D targets; and (5) accessories, such as bow cases, arrow quivers, sights and scopes, and stabilizers. According to the ATA, in 2020, "[t]he US ha[d] 9.9 million bowhunters, 17.6 million recreational archers and 5.4 million competitive archers . . . ." This equates to roughly 13% of the U.S. population over age thirteen.

147.   Because Defendants conspired to raise prices through the adoption, implementation, and enforcement of MAPs on the Archery Products market in the United States as a whole, it is appropriate to analyze the competitive effects of the MAP policies on this market as a whole. That is, grouping these products into a single product market allows for an efficient analysis of the competitive effects of the industry-wide MAPs without any analytical difference.

148.   At all relevant times, Defendants and their co-conspirators have collectively possessed market power at each and every level of the United States market for Archery Products, including the manufacturing, distribution, and retail sales level. That is, they maintained the ability to raise prices significantly above competitive levels profitably, without losing a commensurate number of sales.

149.   Specifically, a hypothetical firm or cartel that controlled substantial

share of the market for Archery Products, as Defendants and their co-conspirators do, could profitably impose a small but significant non-transitory increase in prices for Archery Products. Due to the conduct challenged herein and other factors, consumers would not be able to defeat such artificial price inflation by shifting to other companies or products.

## VII.   DEFENDANTS' FRAUDULENT CONCEALMENT

150.   Any applicable statute of limitations has been tolled by Defendants' knowing and active concealment of their unlawful conduct. Throughout the Class Period, Defendants affirmatively and fraudulently concealed their unlawful and anticompetitive conduct.

151.   Plaintiff and the Class did not discover, nor could they have discovered through the exercise of reasonable diligence, the existence of the conduct alleged herein prior to retaining counsel in 2024.

152.   Further, the very nature of Defendants' conduct was secret and self-concealing inasmuch as Defendants hid their horizontal price-raising agreement and simply called them "MAPs," when in fact, they were collusively established "policies" aimed at artificially raising prices and restricting competition at the retail level.

153.   For instance, and as noted above, Defendants' conspiratorial campaign

to adopt, implement, and enforce industry-wide MAPs began and was coordinated behind the ATA's closed doors. These meetings, including the ATA's annual Trade Shows, were closed to consumers.

154. Similarly, and also as noted above, sometime after June 2021, the ATA began scrubbing its website of potentially problematic references to its role in coordinating the adoption, implementation, and enforcement of industry-wide MAPs.

## VIII.  PLAINTIFF'S CLAIM FOR RELIEF

### Violation of the Sherman Act
### (15 U.S.C. §§ 1 and 3)

155. Plaintiff hereby restates Paragraphs 1 through 154 of this Complaint as if fully set forth herein.

156. Beginning no later than 2014 and continuing to the present, Defendants and their co-conspirators have engaged in a conspiracy and agreement in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3). Their cartel, chiefly orchestrated through the ATA, was designed to artificially raise prices and eliminate horizontal price competition for Archery Products at the retail level. The primary means by which Defendants and their co-conspirators operate the cartel is through their agreement for the widespread adoption, implementation, and enforcement of MAP policies, which, in practice, set

an artificial price floor and increase prices of Archery Products. The agreed-upon MAPs represented a drastic change in how Archery Products were sold in the United States.

157.    Thus, this Complaint presents allegations of violations of the federal antitrust laws that are illegal *per se*.

158.    In the alternative, Plaintiff alleges Defendants and their co-conspirators have engaged in a violation of Sections 1 and 3 of the Sherman Act under either a quick look or a fully-fledged rule of reason analysis.

159.    As a result of Defendants' and their co-conspirators' unlawful conduct, retail prices for Archery Products subject to agreed-upon MAPs were fixed, raised, maintained, or stabilized in the United States.

160.    As a result of Defendants' and their co-conspirators' unlawful conduct, Plaintiff and the other members of the Class have been injured in that they have paid more for Archery Products than they otherwise would have paid in the absence of that conduct.

161.    With respect to their claim under the Sherman Act, Plaintiff seeks injunctive relief, treble damages, and attorneys' fees and costs.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays the Court enter judgment on his behalf and on behalf of the Class herein, adjudging and decreeing as follows:

A.    This action may proceed as a class action, with Plaintiff as the designated Class representative and his counsel as Class Counsel;

B.    Defendants and their co-conspirators have engaged in a contract, combination, and conspiracy in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3), and that Plaintiff and the members of the Class have been injured in their business and property as a result of Defendants' and their co-conspirators' violations;

C.    Plaintiff and the members of the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a judgment in favor of Plaintiff and the Class be entered against Defendants in an amount to be trebled to the extent such trebling is permitted pursuant to such laws;

D.    Plaintiff and the members of the Class recover restitutionary relief to the extent such relief is afforded by any of the aforementioned laws;

E.    Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and

75

employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

F.      Plaintiff and the members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

G.      Plaintiff and the members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

H.      Plaintiff and the members of the Class receive such other or further relief as may be just and proper.

## X.   <u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.


Dated: December 19, 2025               Respectfully submitted,

                                       /s/ *Mark K. Wasvary*
                                       Mark K. Wasvary P51575
                                       Mark K. Wasvary, P.C.
                                       Local Counsel

2401 W. Big Beaver Rd, Ste 100
Troy MI  48084
248-649-5668
mark@wasvarylaw.com


By: */s/ Jason L. Lichtman*
Jason L. Lichtman (18770)
Lieff Cabraser Heimann & Bernstein, LLP
250 Hudson Street
New York, NY 10013
(212) 355-9500
jlichtman@lchb.com

Gary I. Smith, Jr. (*pro hac vice* forthcoming)
Hausfeld LLP
580 California Street, 12th Floor
San Francisco, CA 94101
(415) 633-1908
gsmith@hausfeld.com

Will Hanna (*pro hac vice* forthcoming)
Hausfeld LLP
888 16th Street, N.W., Suite 600
Washington, DC 20006
(202) 540-7200
whanna@hausfeld.com


David W. Kesselman (*pro hac vice* forthcoming)
Abiel Garcia (*pro hac vice* forthcoming)
Amy T. Brantly (*pro hac vice* forthcoming)
Kesselman, Brantly, Stockinger LLP
1230 Rosecrans Avenue, Suite 400
Manhattan Beach, CA 90266
(310) 307-4555

77

dkesselman@kbslaw.com
agarcia@kbslaw.com
abrantly@kbslaw.com

Joshua H. Grabar (*pro hac vice* forthcoming)
Julia C. Varano (*pro hac vice* forthcoming)
Graber Law Office
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
(267) 507-6085
jgrabar@grabarlaw.com
jvarano@grabarlaw.com

*Attorneys for Plaintiff and the Proposed Class*